*331 OPINION OF THE COURT
Margaret Gammer, J.
In this CPLR article 78 proceeding, petitioners First Baptist Church of Crown Heights Center for Nursing & Rehabilitation, Inc. (First Baptist) in action No. 1 and Urban Strategies, Inc. (Urban Strategies) in action No. 2 move, individually, by separate orders to show cause, for: (1) a judgment declaring that the Department of Health of the State of New York (the Department) has an affirmative duty to process their applications for the establishment and construction of their nursing homes in conformity with applicable statutes, regulations and its own practices, patterns and procedures; (2) an order directing the Department to process their applications in conformity with applicable statutes, regulations and its own practices, patterns and procedures; (3) a judgment declaring that the Department’s announced policy of declining to process all pending nursing home establishment applications (the moratorium) is in the nature of a rule as defined in and subject to the State Administrative Procedure Act; and (4) an order declaring the moratorium ineffective due to noncompliance with State Administrative Procedure Act § 202.
Facts and Procedural History
In 1990, as a result of the recognition of the need for residential health care facilities in minority communities, the State established an initiative (the Initiative) to develop such facilities, with such projects to be completely funded through the issuance of bonds and the provision of mortgage insurance.[1] In furtherance of their corporate purposes and in reliance upon the Initiative, First Baptist and Urban Strategies, both minority not-for-profit corporations located in Brooklyn, each submitted to respondent in 1990 and 1991, respectively, a Certificate of Need application (CON), pursuant to article 28 of the Public Health Law, to establish, construct and operate a residential health care nursing home, each to be located in Brooklyn, New York.
Pursuant to article 28 of the Public Health Law, which governs the establishment and construction of nursing homes (see generally, Public Health Law §§ 2800, 2801 [1]), separate approval processes exist for review of applications for nursing *332 home establishment and construction. However, these processes are combined when an applicant seeks the Department’s approval to both establish and construct a nursing home. Briefly, the Public Health Council (PHC), established pursuant to Public Health Law § 220, acts on nursing home establishment applications with the advice of the State Hospital Review and Planning Council (SHRPC) (Public Health Law § 2904) and the health systems agency having geographical jurisdiction of the area where the proposed nursing home is to be located (Public Health Law § 2801-a [2]). The PHC may disapprove the application, affording the applicant a public hearing, or approve the application with or without contingencies, which the applicant must satisfy before the Department will issue an operating certificate (Public Health Law § 2801-a [2]).
Nursing home construction applications require the prior approval of the Commissioner (Public Health Law § 2802). As with the PHC, the Commissioner acts on nursing home construction applications with the advice of the SHRPC and the health systems agency (Public Health Law § 2802 [1], [2]). The Commissioner may not act upon such an application unless the SHRPC and the health systems agency have submitted their recommendations, the applicant has obtained the necessary approvals required for its incorporation and establishment, and, as particularly relevant here, the Commissioner is “satisfied as to the public need for the construction” (Public Health Law § 2802 [2] [b]). As with the PHC, the Commissioner may disapprove the application, entitling the applicant to a hearing, or approve or contingently approve the application (10 NYCRR 710.2 [e]). Approval or contingent approval of a construction application does not authorize construction to begin; it merely allows the applicant to proceed in the construction approval process that may or may not result in approval of actual construction (10 NYCRR 710.2 [e] [1]).
Application Histories
First Baptist
Upon the Department’s receipt of First Baptist’s application, and after seeking and ultimately receiving additional information because the application was incomplete, the PHC advised First Baptist, in November 1992, that it had contingently approved its application for establishment of the nursing home. Thereafter, by letter dated December 30, 1994, the PHC advised petitioner that all contingencies with respect to this ap *333 plication had been met and that the application had been approved.
In December 1992, the Department advised petitioner that its application for construction of the home had also been approved, subject to 11 contingencies. Thereafter, petitioner requested from the Department an extension of its approved construction start and end dates five times. In 1995, the Department imposed a requirement that petitioner partner with a person or entity with past expertise in the operation of nursing homes. Thereafter, in 1996, the Department then required petitioner to provide 10% of the project costs, amounting to approximately $3,000,000. The record reveals that as of May 3, 1996 three contingencies with respect to the construction application remained unsatisfied.
Sometime after 1999, after an extensive search, petitioner found a new partner with nursing home experience willing to provide the necessary capital. Petitioner submitted to the Department revisions to its application to include this new partner by letter dated June 29, 2000. By letter dated July 3, 2000, the Department reminded petitioner that all outstanding contingencies required resolution prior to approval of actual construction. Petitioner sought a further extension of its construction start and end dates, which request remains pending.
Urban Strategies
Upon the Department’s receipt of Urban Strategies’ application, and after seeking and receiving additional information because the application was incomplete, the Department advised petitioner in December 1992 that it had approved the application for construction of the nursing home subject to seven contingencies. In October 1993, petitioner requested that the Department approve a change in the project’s site, which was granted. At that time, several contingencies remained outstanding, causing petitioner to seek an extension of its approved construction start and end dates, which was also granted. In May 1994, petitioner sought review of the new site pursuant to the Uniform Land Use Review Procedure, which, due to the necessity of obtaining a permit, took two years to complete. During this time period, petitioner was also informed that its financing from SONYMA could not be implemented. Throughout this time period, petitioner requested an extension of its approved construction start and end dates eight times.
In 1996, after an additional review of the project’s financing, the State, through SONYMA, required that petitioner provide *334 approximately $3,000,000 of working capital to the project. At this time, the record reveals that petitioner had not satisfied all the contingencies necessary for approval of its application.
In 1997, the State required petitioner to conduct a new financial feasibility study for the project. Sometime thereafter, SONYMA advised petitioner that it would no longer finance the project. As such, after an extensive search, petitioner found a partner willing to provide the necessary working capital and conventional financing.
In January 2000, petitioner submitted a revised application to add its new partner, which required PHC approval (10 NYCRR 600.3 [c] [7]; 710.5 [b] [7]). In March 2000, upon initial review of the amended application, the Department advised petitioner that the application was incomplete and requested additional information. Upon receiving that information, the Department advised petitioner that it had distributed the application for processing. Thereafter, in May 2000, the Department’s review revealed the need for additional information, which petitioner provided in June 2000. At that time, the Department also granted petitioner’s request to amend the construction start and end dates, and reminded petitioner that all outstanding contingencies required resolution prior to approval of actual construction. Shortly thereafter, petitioner requested another extension of its construction start and end dates, which remains pending.
The Moratorium
At the August 3, 2000 meeting of the SHRPC, the Department announced a moratorium on further processing of “nursing home pipeline” applications, namely, 20 nursing home applications which had received approval from the PHC but had not received approval from the Department to begin construction. According to Wayne M. Osten, Director of Health Systems Management, New York State Department of Health, the pipeline applications share several common characteristics, including their approval, subject to contingencies, in the early to mid-1990’s: their proposed addition of new nursing home beds; their failure to satisfy all contingencies; and their multiple construction start and end date extensions. Mr. Osten states that in light of the present uncertainty regarding the ultimate demand for nursing home beds, and in view of certain evidence so indicating {infra), rather than granting petitioners’ most recent requests for another extension or, in the alternative, disapproving their applications for failure to satisfy *335 required contingencies, the Department determined to impose “a temporary moratorium,” allowing it, in consultation with the PHC and SHRPC, to reassess the public need for additional nursing homes. Mr. Osten also states that the Department plans to consider possible changes in the methodology by which nursing home bed need is determined, as the current methodology has not been revised for 10 years. Mr. Osten met with petitioners’ representatives in August 2000 to discuss the moratorium and thereafter notified each nursing home pipeline applicant thereof in writing by letter dated October 13, 2000, advising them against expending additional funds or making further commitments to advance their projects.
Thereafter, petitioners each filed a verified petition with this Court on October 31, 2000, seeking the relief set forth above. The relief sought is in the nature of mandamus to compel the Department, pursuant to CPLR 7803 (1), to continue processing their pending CON applications for the construction and establishment of their nursing homes and for an extension of their projects’ construction start and end dates. On November 13, 2000, petitioners brought separate orders to show cause for the relief set forth above to expedite the matter on the grounds that the moratorium will prevent them from building the nursing homes and cost them substantial monies already expended thereon.
Analysis
Petitioners argue that the Department’s refusal to process their applications violates the Department’s duties under the relevant statutes, regulations and its own practices. They also contend that the instant proceeding, characterized as one sounding in the nature of mandamus, properly lies to compel the Department to act upon the applications since such action is merely ministerial in nature, namely, it does not seek to direct the manner in which the applications are processed or a particular outcome. In their verified petition, petitioners also contend that the Department’s failure to timely process their applications and refusal to extend construction start and end dates places them at risk of losing commitments to acquire the land upon which their facilities are to be built and incurring increased construction and financing costs, causing them irreparable injury for which they have no legal remedy. In addition, as indicated above, petitioners maintain that the mere processing of the applications would not commit the PHC to approve them as licensed operators nor would it commit the Depart *336 ment to approve construction of the nursing homes. Finally, petitioners contend that the temporary moratorium denies them due process and is arbitrary and capricious.
The Department counters that the court is without jurisdiction to review the proceedings because a final determination has not yet been rendered; that the petitions must be dismissed because it acted within its broad discretion in imposing the moratorium; that petitioners are solely responsible for the delay in their application process; and that petitioners’ request for mandamus relief is inappropriate.
It is well settled that mandamus lies to compel a governmental entity or officer to perform a ministerial duty, but is not available to direct an act that involves an exercise of judgment or discretion. The party seeking mandamus must show a clear legal right to relief. The availability of the remedy does not depend on petitioner’s “substantive entitlement to prevail, but on the nature of the duty sought to be commanded — i.e., mandatory, nondiscretionary action.” (Matter of Brusco v Braun, 84 NY2d 674, 679.) However, mandamus may function to compel acts that officials are duty-bound to perform, regardless of whether they may exercise discretion in doing so (Klostermann v Cuomo, 61 NY2d 525, 540).
As noted earlier, Public Health Law § 2802 (2) provides, in relevant part, that “[t]he commissioner shall not act upon an application for construction of a hospital until” (1) the SHRPC and the health systems agency have had a reasonable time to submit their recommendations, and unless (2) the applicant has obtained all required consents and approvals for its incorporation or establishment, and (3) “the commissioner is satisfied as to the public need for the construction, at the time and place and under the circumstances proposed.”
While, initially, compelling the Department to process the applications is contingent upon its discretionary finding as to the public need for construction of the proposed nursing homes (Matter of Hamptons Hosp. & Med. Ctr. v Moore, 52 NY2d 88), here such a finding has been made and is in effect. Under the rules and regulations governing the Department, once a finding as to the estimates of public need for residential health care facilities has been determined for the planning target year, that determination “shall continue to be the estimates of public need for such beds for years subsequent to the planning target year until a new bed need methodology is promulgated.” (10 NYCRR 709.3 [b] [2].)
The methodology to be used to determine public need is not limited to the methodology set forth in 10 NYCRR 709.3 (b) (2). *337 (10 NYCRR 670.3.) However, there is no provision in the rules for a moratorium to stop the wheels of the application process while a new public need finding is pending. To the contrary, 10 NYCRR 709.3 (b) (2)’s language is clear and mandatory in stating that the determination for the planning target year shall continue to be the estimates of public need for such beds for years subsequent to the planning target year until a new bed need methodology is promulgated (see, Matter of New York Pub. Interest Research Group v Dinkins, 83 NY2d 377). Absent such new promulgation, the prior public needs determination is, by law, the current needs determination and it cannot be allowed to be thwarted by a moratorium not sanctioned by law. Moreover, contrary to respondent’s contentions, the moratorium— which has no end date — denies petitioners due process since it has the practical effect of imperiling their projects without providing them with any redress or mechanism of appeal. As aptly noted by the Appellate Division, “the power to delay (without limit) is the power to destroy.” (Matter of New York Pub. Interest Research Group v Giuliani, 228 AD2d 276, 277.) Accordingly, respondent’s contention that compelling it to process petitioners’ applications would constitute an improper substitution of this Court’s judgment for the judgment of the Department is without merit. Respondent is not being compelled to make any particular determination but, rather, to follow the procedures mandated by law relative to the processing of petitioners’ applications.
The Department’s argument that there is a rational basis for the moratorium[2] which petitioners have failed to rebut does not address the core question involved in this proceeding, Pub- *338 lie Health Law § 206 (1) (a), which directs the Commissioner to “take cognizance of the interests of health and life of the people of the state” and to “exercise the functions, powers and duties of the department prescribed by law,” obligates the Department to affirmatively process petitioners’ applications. Clearly, the statute directs the Commissioner to abide by the law, and as the law mandates that the finding of public need continues until a new finding is promulgated, the Department must process applications in accordance with Public Health Law.
Petitioners additionally argue that the Department violated the provisions of the State Administrative. Procedure Act by imposing the moratorium, which is in fact a rule, without complying with the State Administrative Procedure Act. Specifically, they contend that consideration of all pipeline projects together, regardless of location or other relevant facts and circumstances which the Department must consider in making its health care decisions (see, 10 NYCRR 709.1; Public Health Law § 220) — constitutes a fixed, general principal.
Under the State Administrative Procedure Act, a “rule” is defined as, inter alia, “the whole or part of each agency statement, regulation or code of general applicability that implements or applies law” (State Administrative Procedure Act § 102 [2] [a]). “Whether an administrative action constitutes a rule depends upon whether the action is a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers.” (Matter of Ex-L Ambulette v Commissioner of N. Y. State Dept. of Social Servs., 268 AD2d 431, 432, lv denied 95 NY2d 753.)
“The term, ‘rule or regulation’, has not, it is true, been the subject of precise definition, but there can be little doubt that, as employed in the constitutional provision, it embraces any kind of legislative or quasi-legislative norm or prescription which establishes a pattern or course of conduct for the future.” (People v Cull, 10 NY2d 123, 126; Matter of Alca Indus. v Delaney, 92 NY2d 775.)
The nature of the moratorium imposed by the Department compels the finding that it is a rule. First, the authority granted the Department by statute is to make a public needs determination. As stated earlier, the rules state that once such determination is promulgated, it remains in effect until a new promulgation is issued. While the Department certainly has the right to study public needs and issue a new promulgation consistent with changes in circumstances, it has no statutory *339 authority to issue a blanket, unlimited moratorium during the interim of its study. Nevertheless, the Department issued an all-inclusive policy of postponing all determinations. Second, the application of the moratorium was instituted across the board without the Department’s assessment of the individualized circumstances of each applicant, including petitioners (see, Matter of Taylor v New York State Dept. of Correctional Servs., 248 AD2d 799). Third, the moratorium was adopted without means of legislation (see, Mitchell v Kemp, 176 AD2d 859; see also, Cellular Tel. Co. v Village of Tarrytown, 209 AD2d 57, lv denied 86 NY2d 701).
Moratoria are routinely enacted through legislation. For example, in Mitchell (supra), the Town of Pine Plains enacted a moratorium regarding zoning as a stopgap method of maintaining the status quo pending the preparation and enactment of a comprehensive zoning ordinance. It renewed it by legislation for almost five years. In Cellular Tel. Co.[3] (supra), the Village of Tarrytown enacted a temporary moratorium prohibiting the use of property for the enhancement of cellular telephone service based upon unproven health risk claims. It, too, successively renewed the legislation upon expiration of the initial moratorium. The moratorium in this case has the effect of changing a statutory mandate and was applied in an across-the-board manner. However, unlike the cited cases, it was accomplished by administrative fiat. It is clearly quasi-legislative in nature and therefore constitutes a rule.
Finally, and importantly, the Florida Court of Appeals was confronted with a virtually identical case to the one at hand and it reached the same conclusion. In Balsam v Department of Health & Rehabilitative Servs. (452 So 2d 976 [Fla Dist Ct App, 1st Dist]), appellants sought review of a ruling by the State of Florida’s Department of Health and Rehabilitative Services which determined that an administrative moratorium of finite duration had been imposed on CON applications, and, therefore, refused to process appellant’s application. The court held that the moratorium was an invalid rule under Florida’s equivalent of New York’s State Administrative Procedure Act. The logic is even more compelling here where the moratorium is of indefinite duration.
Accordingly, the petitions are granted to the extent that moratorium issued by the Department is vacated and respon *340 dent is directed to continue to process petitioners’ applications in conformity with applicable statutes, regulations and the Department’s own practices, patterns, and procedures.

. New York State Medical Care Facilities Finance Agency would raise the funds by issuing bonds and the State of New York Mortgage Agency (SONYMA) would provide the mortgage insurance.

. In his affidavit, Mr. Osten, Director of Health Systems Management, asserts that in 1999, the statewide and Kings County nursing home occupancy rate declined by approximately 3% since 1992; that the SHRPC’s 1997 study on subacute care cited “the declining demand” for nursing home beds and received testimony at a public hearing that no additional nursing facility beds were needed, and that the lessening of demand for nursing home beds is attributable to many related factors, including the increased use of adult homes and assisted living programs, the expiration in July 1999 of State laws requiring fiscal assessments for Medicaid recipients, and continued compliance with the Americans with Disabilities Act. The Department further contends that, even assuming the existence of statistical error or empirical imperfections in its findings, it need only demonstrate, as it has done here, that the moratorium presents “a rational application of broader judgmental considerations by respondent Commissioner of Health based upon the expertise and experience of the agency he heads” (Matter of New York Assn. of Homes & Servs. for Aging v Commissioner of N. Y. State Dept. of Health, 212 AD2d 163, 172 [dissenting opn], revd on dissenting opn 87 NY2d 978).

. In both cases, the Appellate Division found the legislation to be unconstitutional on reasons unrelated to the issue presented here.